STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

14-149

STATE OF LOUISIANA

VERSUS

CARL J. WEBB, JR.

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, DOCKET NO. 15269-09
HONORABLE CLAYTON DAVIS, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Elizabeth A. Pickett, James T. Genovese, and Phyllis M. Keaty, Judges.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Douglas Lee Harville
Louisiana Appellate Project
400 Travis Street, Suite 1702
Shreveport, Louisiana 71101-3144
(318) 222-1700
COUNSEL FOR DEFENDANT/APPELLANT:
    Carl J. Webb, Jr.


Carl James Webb, Jr.
#357842
Louisiana State Penitentiary
T.U. Lower-E-Cell-13
Angola, Louisiana 70712
    In Proper Person

**John F. DeRosier**
**District Attorney—Fourteenth Judicial District**
**Carla S. Sigler and**
**Karen C. McLellan**
**Assistant District Attorneys**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, Louisiana 70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**GENOVESE, Judge.**

In this criminal case, Defendant, Carl J. Webb, Jr., appeals his convictions and sentences on three counts of illegal possession of a stolen firearm and one count of possession of a firearm by a convicted felon which resulted in a habitual offender adjudication and an aggregate sixty-five year sentence without benefits. For the following reasons, we affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## FACTS

On February 12, 2009, various guns were stolen during a burglary of a home in Calcasieu Parish owned by Clifton Reed. Although Defendant was charged with the simple burglary of Mr. Reed's home as well as the illegal possession of firearms stolen from Mr. Reed's home, Defendant was found not guilty of simple burglary and not guilty of illegally possessing some of the weapons. Defendant, however, was found guilty of illegally possessing three of the guns taken from Mr. Reed's home and possession of a firearm by a convicted felon. The weapons were not found in Defendant's possession, but were allegedly distributed by Defendant after they were stolen.

## PROCEDURAL HISTORY

Defendant was charged by bill of information with six counts of illegal possession of stolen firearms, violations of La.R.S. 14:69.1; one count of possession of a firearm by a convicted felon, a violation of La.R.S. 14:95.1; and, one count of simple burglary, a violation of La.R.S. 14:62. Defendant pled not guilty to the charges.

On April 11, 2012, after a trial by jury, Defendant was found guilty on count two—possession of a stolen firearm (Smith & Wesson .38 caliber revolver); count

three—possession of a stolen firearm (Smith & Wesson .38 caliber revolver); and, count five—possession of a stolen firearm (Fabrique National Semi-Auto Pistol). Defendant was also found guilty of one count of possession of a firearm by a convicted felon. Defendant was found not guilty on counts one, four, and six on the verdict sheet—each of which was illegal possession of stolen firearms—and not guilty of simple burglary.

On April 23, 2012, the State filed a habitual offender bill, charging Defendant as a fourth habitual offender. After a hearing held June 13, 2012, Defendant was adjudicated a fourth habitual offender. On Defendant's convictions on three counts of illegal possession of stolen firearms, the trial court imposed a five-year sentence on each count to run consecutively. On Defendant's conviction of possession of a firearm by a convicted felon, the trial court imposed an enhanced sentence of fifty years at hard labor to run consecutively to the other sentences. The trial court also stated that the enhanced sentence was to be served "without benefit." Defendant objected to the sentence and moved for reconsideration of the sentence in light of its excessiveness. The trial court denied Defendant's motion to reconsider sentence. Defendant has appealed, alleging the following four assignments of error filed by defense counsel and five pro se assignments of error:

## ASSIGNMENTS OF ERROR

### *ASSIGNMENTS OF ERROR BY DEFENSE COUNSEL:*

1. There was insufficient evidence to prove that Carl J. Webb, Jr., was guilty beyond a reasonable doubt of the offenses of (1) Count 2 – illegal possession of a stolen firearm, a Smith & Wesson .38 caliber revolver; (2) Count 3 – illegal possession of a stolen firearm, a second Smith & Wesson .38 caliber revolver; (3) Count 5 – illegal possession of a stolen firearm, a Fabrique

2

National semi-auto pistol; or (4) possession of a firearm by a convicted felon.

2.     Carl J. Webb, Jr.'s conviction and sentence for possession of a firearm by a felon violated his constitutional rights set forth in [La.Const. art. 1, § 11].

3.     The trial court erred in imposing a sentence herein that is unconstitutionally excessive.

### *SUPPLEMENTAL ASSIGNMENT OF ERROR BY DEFENSE COUNSEL:*

4.     The [t]rial [c]ourt erred in finding that Carl James Webb, Jr., was a [f]ourth [h]abitual [o]ffender, when, in fact, the State offered evidence sufficient to establish only that Mr. Webb was a [s]econd [h]abitual [o]ffender.

### *PRO SE ASSIGNMENTS OF ERROR[1]:*

[5.]     Trial court erred in finding that defendant was a fourth habitual offender[] when[,] in fact, the [S]tate failed to prove or show evidence of a third prior felony conviction[.]

[6.]     The [S]tate erred in the habitual offender [bill of] information by listing ([2]) simple burglary convictions from Cameron [P]arish in 2001 as a basis or predicat[e] for possession of [a] firearm [by a] convicted felon[,] and thus both burglary convictions and possession of [a] firearm [by a] convicted felon can't be used on habitual offender bill of information. Only burglaries or possession of firearm as convicted felon may be used.

[7.]     Trial [c]ourt erred in imposing an illegal sentence where (3) Cameron Parish burglary convictions are prior convictions used as [an] element in possession of [a] firearm [by a] convicted felon . . . and was used [as a] prior felony in habitual offender bill of information and can't use prior conviction as [an] element of predicate in habitual offender bill of information[;] therefore[,] have no prior conviction to classify as second, third or fourth habitual offender; and[,] as a result, can't be sentenced or enhanced on possession of [a] firearm [by a] convicted felon is an enhanced charged in itself upon subsequent conviction[.]

---

[1]Two separate sets of pro se briefs with a total of five separate pro se assignments of error were filed on June 2, 2014. These five pro se assignments of error are listed in their respective pro se briefs as "ASSIGNMENT OF ERRORS" numbers "1." and "2." and "SUPPLEMENTAL ASSIGNMENT OF ERROR" numbers "5.)", "6.)" and "7.)". For clarity and avoidance of confusion, these five pro se assignments of error have been combined and renumbered as "PRO SE ASSIGNMENTS OF ERROR 5., 6., 7., 8., and 9."

[8.] The trial court erred in denying appellant's motion for mistrial based upon a prejudicial article printed the morning of venire selections that revealed other crimes, which could contaminate the prospective jurors against appellant.

[9.] The trial court erred in denying appellant's defense counsel from polling the jurors about the prejudicial article of other crimes.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find an error patent relative to Defendant's habitual offender sentence which is hereinafter addressed in Supplemental Assignment of Error Number Four and Pro Se Supplemental Assignments of Error Numbers Five and Seven.

## ASSIGNMENT OF ERROR NUMBER ONE:

As noted in the procedural history, the jury found Defendant not guilty on three counts of illegal possession of stolen firearms (i.e., counts one, four, and six). The jury also found Defendant not guilty of simple burglary. In this assignment of error, Defendant argues that the evidence was insufficient to prove that he possessed the firearms at issue in the three counts for which he was found guilty (i.e., counts two, three, and five). He alleges that:

> [t]he testimony at trial failed to establish that Carl J. Webb, Jr., possessed the "stolen" weapons he was convicted of possessing: (1) Count 2 – a Smith & Wesson .38 caliber revolver; (2) Count 3 – a second Smith & Wesson .38 caliber revolver; or (3) Count 5 – a Fabrique National semi-auto pistol. While there was evidence that Mr. Webb may have possessed firearms under circumstances that suggest they possibly may have been stolen, the record on appeal fails to establish that Mr. Webb ever possessed (1) the Smith & Wesson .38 caliber revolver set forth in Count 2; (2) the Smith & Wesson .38 caliber revolver set forth in Count 3; or (3) the Fabrique National semi-auto pistol set forth in Count 5. Therefore, the evidence at trial failed to prove beyond a reasonable doubt that Mr. Webb possessed the "stolen" weapons he was convicted of possessing: (1) Count 2 – a Smith & Wesson .38 caliber revolver; (2) Count 3 – a second Smith

4

& Wesson .38 caliber revolver; or (3) Count 5 – a Fabrique National semi-auto pistol.

Defendant further alleges that because there was no evidence to link him to possession of firearms, stolen or otherwise, the evidence was insufficient to convict him of possession of a firearm by a convicted felon.

The State, on the other hand, argues that the evidence presented at trial proved that Defendant "likely stole the weapons himself[,]" or, at the very least, knew the weapons were stolen. The State further alleges "[t]his is evident from the way [Defendant] conducted himself and his conflicting accounts of the source of the firearms. Based on the totality of the circumstances and the ample evidence presented by the State," the State argues that "[Defendant] was properly convicted for three counts of illegal possession of stolen firearms." Finally, the State alleges that the evidence was also sufficient to convict Defendant of possession of a firearm by a convicted felon.

This court has stated the following regarding the standard for reviewing a claim of insufficient evidence:

> The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Captville*, 448 So.2d 676, 678 (La.1984)). The *Jackson* standard of review is now legislatively embodied in La.Code Crim.P. art. 821. It does not allow the appellate court "to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La.2/22/06), 922 So.2d 517, 521 (citing *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165; *State v. Lubrano*, 563 So.2d 847, 850 (La.1990)). The appellate court's function is not to assess the credibility of witnesses or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442.

5

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than ensuring the sufficiency evaluation standard of *Jackson,* "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Id.* at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder's role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.' " *McDaniel v. Brown*, 558 U.S. [120], [134], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). When so viewed by an appellate court, the relevant question is whether, on the evidence presented at trial, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789. Applied in cases relying on circumstantial evidence, . . . this fundamental principle of review means that when a jury "reasonably rejects the hypothesis of innocence presented by the defendant[ ], that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984).

*State v. Strother*, 09-2357, pp. 10-11 (La. 10/22/10), 49 So.3d 372, 378 (alteration in original).

*State v. Francis*, 12-1221, pp. 6-7 (La.App. 3 Cir. 4/3/13), 111 So.3d 529, 533, *writ denied*, 13-1253 (La. 11/8/13), 125 So.3d 449.

A review of the record indicates that Officer Dale Trahan of the Calcasieu Parish Sheriff's Office investigated a burglary in Moss Bluff on February 12, 2009. The homeowner, Mr. Reed, told Officer Trahan that about ten guns had been stolen from his residence. On cross-examination, Officer Trahan testified that the

homeowner's wife left a door unlocked, and there was no forced entry into the home. When asked if the homeowner provided any leads, Officer Trahan stated that the homeowner "mentioned something about a sister or -- or a brother-in-law or something or ex-brother-in-law, which I put . . . in the report, but where it went from there, I don't know."

Detective Mark Clark of the Calcasieu Parish Sheriff's Office also investigated the February 12, 2009 Moss Bluff burglary. On February 27, 2009, Crime Stopper's received a tip in reference to Frederick "Freddie" Burt (Freddie) and Defendant, "C.J. Webb." According to defense counsel, Defendant is known as "C.J." When Detective Clark spoke with Freddie, Freddie told him:

> [H]e advised us that he was contacted by [Defendant] and advised that he had something he wanted to show him, so Freddie and his girlfriend had gone out to his house, and he showed him several guns in boxes. He said [Defendant] advised him that he'd stolen them from a house in the Topsy area.

According to Detective Clark, Freddie also told him that Defendant said there were "four-wheelers and other things that he wanted him to go back and help him steal." When Detective Clark went to visit with the homeowner, he noticed a couple of four-wheelers, a motorcycle, and other things parked on the homeowner's property. Detective Clark spoke to the homeowner later by telephone and learned that the guns that were stolen were handguns.

Detective Clark also spoke with Molly Lou Allen (Molly Lou), Freddie's mother. During the course of his investigation, Detective Clark learned that Molly Lou purchased a couple of stolen weapons from Defendant. Molly Lou also stated that she threw the guns in the ship channel in Cameron Parish.

Detective Clark stated that a Cameron Parish detective had contacted his lieutenant and "advised him that some guns were found by some juveniles in that

7

general area which could have possibly been involved in the burglary." When asked if the guns were ever recovered, Detective Clark replied that two boxes with guns were found floating in the ship channel. Detective Clark stated that, according to one of the juveniles, four guns were actually found, but one was thrown back into the ship channel. Thus, only three guns were recovered.

Detective Clark identified one of the two guns that were initially recovered. He stated that the second gun was reportedly thrown back into the water. When asked if these guns were ever identified, Detective Clark replied, "After speaking with the victim of the burglary and getting some description, I felt that this was one of the guns taken from Mr. Reed's residence."

During his investigation, Detective Clark stated that Rick Papillion's name was mentioned as a person who possessed some of the stolen weapons.[2] Detective Clark contacted Mr. Papillion, and two or three weapons were recovered from the house of Mr. Papillion's aunt. Detective Clark identified photos of two pistols recovered from the residence of Mr. Papillion's aunt as well as an AK-47 recovered from Mr. Papillion's vehicle. According to Detective Clark, Mr. Papillion stated that he left the guns at his aunt's residence because he had children at his house.

When asked if he had ever come into contact with Defendant, Detective Clark replied, "Yes, sir[,]" and identified Mr. Webb as Defendant. According to Detective Clark, Defendant was asked to give a statement, but he declined. Additionally, Defendant did not provide any information regarding the ownership of any of the weapons. Detective Clark also learned that Defendant lived 6.12 miles from the victim's residence.

---

[2]Later in the record, Mr. Papillion is referred to as "Ray Papillion."

On cross-examination, Detective Clark clarified his testimony, stating that Molly Lou never stated that she purchased firearms from Defendant. Rather, he testified that Molly Lou stated that she found a couple of boxes containing guns at her residence. Molly Lou assumed the guns were stolen. Detective Clark also testified that, according to Freddie, Molly Lou bought some guns.

Cameron Parish Sheriff's Deputy Donald Ogea testified that on February 24, 2009, he responded to a call involving an ungovernable juvenile. During the call, Detective Ogea learned that a gun was found by the river. Deputy Ogea identified a box and a weapon he retrieved on February 24, 2009.

Thomas Mefford of the Calcasieu Parish Sheriff's Office was dispatched on February 24, 2009, to meet Cameron Sheriff's deputies to retrieve a weapon. Deputy Mefford identified the gun he retrieved and a "plastic Smith & Wesson box." Additionally, Deputy Mefford testified that "Smith & Wesson" is a very common firearms' maker. According to Deputy Mefford, the gun was a small caliber, possibly a .22 revolver type gun, containing the letters "GK."

Andre Crawford, a crime scene technician with the Calcasieu Parish Sheriff's Office, was instructed, on or about March 4, 2009, to recover an AK-47 from a vehicle. Deputy Crawford also recovered two handguns located in a gun case. According to Deputy Crawford, the AK-47 was wrapped in a blanket underneath the back seat of the vehicle. Deputy Crawford also identified a Fabrique National semiautomatic handgun that he photographed and recovered from the vehicle.

When asked specifically if he was at Mr. Papillion's house or the house of Mr. Papillion's aunt when he recovered the guns, Deputy Crawford answered, "I'm unsure of whose house it was." Deputy Crawford identified the pictures of the

9

residence where he retrieved the guns from the vehicle. He also acknowledged that he saw the weapons he retrieved in the photographs. He further identified the handgun he retrieved from the scene that day.

Deputy Christopher Cormier of the Calcasieu Parish Sheriff's Office testified that on or about March 3, 2009, he received some guns from Detective Kim Nunez with the Cameron Parish Sheriff's Office. Deputy Cormier identified two snub-nose revolvers, one of which had a red rose on the grip.

Freddie testified that on December 14, 2009, he pled guilty to possession of a stolen firearm—an assault rifle. According to Freddie, he received the weapon from Defendant. When asked to explain exactly how he came into contact with the weapon, Freddie replied, "C.J. asked me to go over to check something out. I didn't know exactly what it was, because it wasn't mentioned over the phone. So when I got over there, he had, like, just three boxes of guns." He described the boxes as "little blue boxes" and estimated the number of guns to be five or six, including the rifle. Freddie testified that Defendant asked if he could get rid of the guns. He also stated that Defendant had a couple of .38 revolvers, an English Bulldog, an AK-47, and more that he could not name.

When asked where he was on February 12, 2009, Freddie answered that he was at his mother's house located at 705 Orange Street in Lake Charles and that he had been drinking that day. He could not recall everyone who was at his mother's house, but he remembered that Defendant came to his mother's house, driving a white Chevrolet pickup truck. Freddie stated that Defendant went into the house with one blue box containing one or two guns and that Defendant was trying to sell the guns for "[f]ifty to twenty-five dollars apiece." According to Freddie's

testimony at trial, Defendant stated that he got the guns out of an empty trailer, and that there were four-wheelers at the home.

On cross-examination, Freddie admitted that he had been previously convicted of carjacking and illegal possession of a stolen firearm. When pressed during his testimony at trial, Freddie stated, "Excuse me. Man, back then, I was addicted to Xanax, so my memory on that -- that day, you know what I'm saying, is really not too good." He also stated that Defendant sold weapons to his mother, Molly Lou.

Mr. Reed, the owner of the home from which the guns were stolen, testified that when he arrived home on February 12, 2009, he noticed that stuff was thrown all over his bedroom and that all of his guns were gone. According to Mr. Reed, the guns were either loose, in soft cases, or in a plastic case. Mr. Reed described the cases as two blue hard cases and several black cases, and he stated that the guns taken from his residence were all pistols. When asked if any of the guns had distinct markings, he stated that there was a "chrome revolver with a white handle and a red rose on it. It was a .38." Mr. Reed also testified that there was a matching set of .38 revolvers and that there was an AMT .30 Carbine automatic.

During his testimony, Mr. Reed was shown photographs introduced by the State of various guns and boxes and asked if he saw anything that belonged to him. He identified the boxes in the photographs as well as the guns as belonging to him, including the gun with the red rose and the one believed to be called a "Fabrique National." Mr. Reed also testified that he does own four-wheelers and that he keeps them in front of his home under a metal carport.

Adelle Burt, Freddie's aunt, testified that on February 12, 2009, she was at her sister's house. She stated that, while there, she saw a person drive up in a

11

small, white GMC truck. Ms. Burt then saw a man exit the truck and carry some blue boxes into the house. According to Ms. Burt, Freddie was also at the house that night along with Ms. Burt's oldest sister, Molly Lou (Freddie's mother). Ms. Burt testified that some handguns were in the boxes. She specifically remembered a "small little gun that had a rose on the handle." Additionally, Ms. Burt testified that there was a silver gun with a black handle and a "longer handgun." When asked if she saw in the courtroom the person who arrived at the home with those guns, Ms. Burt stated that she did not see the person in the courtroom; however, she described the person as having "brownish color" hair, as being dingy looking, and as going by the name "C.J."

According to Ms. Burt, C.J. told her that he got the guns from the "civic center" and was trying to sell the guns for "fifty to a hundred dollars." Ms. Burt testified that she refused to buy any guns from C.J. and, in fact, turned in both C.J. and her nephew, Freddie, because she did not want to be involved with the guns.

On cross-examination, Ms. Burt testified that Freddie met C.J. at the truck when C.J. drove up and that the two men pulled out some blue boxes and went into the house. Although Ms. Burt did not go into the room with the two men, she knew that the men left the room with only some of the boxes they went in with.

The final two witnesses to testify for the State were witnesses called to establish Defendant's status as a convicted felon. Joyce Lynn Miller, a forensic analyst with the Southwest Louisiana Crime Lab, testified as a fingerprint expert. Ms. Miller identified Defendant in court and identified Defendant's fingerprints on several documents, including a bill of information charging Defendant with simple burglary in Cameron Parish. Cassandra Ard, a probation and parole supervisor for

the Department of Corrections, testified that she supervised Defendant for simple burglary convictions. According to Ms. Ard, Defendant was originally placed on probation in 2001.

Louisiana Revised Statutes 14:69.1(A) defines the illegal possession of a firearm as "the intentional possessing, procuring, receiving, or concealing of a firearm which has been the subject of any robbery or theft under circumstances which indicate that the offender knew or should have known that the firearm was the subject of a robbery or theft." In *State v. Johnson*, 09-862, p. 9 (La.App. 3 Cir. 2/3/10), 28 So.3d 1263, 1270, this court summarized the elements of possession of stolen firearms, stating: "Based on this statutory provision, the State had to prove that the defendant intentionally possessed a firearm, that the firearm was the subject of a robbery or theft, and that he knew or should have known the firearm was the subject of a robbery or theft."

Defendant argues that "[w]hile there was evidence that Mr. Webb may have possessed firearms under circumstances that suggest they possibly may have been stolen," the record fails to establish that Defendant possessed the firearms in counts two, three, and five: two Smith & Wesson .38 caliber revolvers and a Fabrique National semi-auto pistol. In his reply brief, Defendant states the following:

> In its brief, the State vaguely describes weapons offered, filed, and introduced into evidence. It does not offer this Court proof or record references to establish to this Court that the Smith & Wesson .38 caliber revolver referenced in Count 2, the second Smith & Wesson .38 caliber revolver referenced in Count 3, and/or the Fabrique National semi-auto pistol referenced in Count 5 were offered, filed, and introduced into evidence by the State or identified by any State witness.

It is apparent that the only element contested by Defendant is his possession of the specific guns charged in the bill of information.

13

Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue. *State v. Lilly*, 468 So.2d 1154 (La.1985). Circumstantial evidence, by contrast, consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. *Id.*; *State v. Bounds*, 38,330 (La.App. 2 Cir. 5/12/04), 873 So.2d 901. When circumstantial evidence forms the basis of the conviction, such evidence must exclude every reasonable hypothesis of innocence. La.R.S. 15:438.

*State v. Jones*, 46,758, 46,759, p. 11 (La.App. 2 Cir. 12/14/11), 81 So.3d 236, 243-44, *writ denied*, 12-147 (La. 5/4/12), 88 So.3d 462. Even though the specific guns charged in the bill of information were not ultimately found in Defendant's possession, we nonetheless find sufficient circumstantial evidence that Defendant possessed the stolen guns.

The homeowner testified that the guns were taken from his home in Moss Bluff in a burglary that occurred on February 12, 2009. On February 27, 2009, Crime Stopper's received a tip that led officers to speak with Freddie. Freddie told the officers that Defendant called him about getting rid of several guns he had stolen from the Topsy area near Lake Charles. Although the evidence at trial did not establish the proximity of Moss Bluff and the Topsy area, defense counsel described the area as the "Moss Bluff / Topsy area." Additionally, Defendant lived 6.12 miles from the home at which the guns were stolen. Freddie also told Detective Clark that Defendant said there were "four-wheelers and other things that he wanted him to go back and help him steal." When Detective Clark went to visit with the homeowner, he noticed a couple of four-wheelers, a motorcycle, and other things parked on the homeowner's property.

There is additional evidence connecting Defendant to the theft of the firearms. According to the homeowner, some of the guns taken from his home

were in blue cases and some were in black cases. At trial, Freddie testified that when he went to see what Defendant wanted to show him, Defendant had several "little blue boxes" and approximately five or six guns, including a rifle. Freddie further testified that on February 12, 2009 (the same day as the burglary), Defendant went to Freddie's mother's house with a blue box containing one or two guns and attempted to sell the guns for "[f]ifty to twenty-five dollars apiece." Ms. Burt specifically remembered a person named "C.J." bringing some blue boxes and a "small little gun that had a rose on the handle" to her sister's house on February 11 and February 12, 2009.

The homeowner testified that a .38 revolver with a red rose on a white handle was taken from his house, as well as a matching set of .38 revolvers. Freddie testified that Defendant had a couple of .38 revolvers, a gun with a red rose on its handle, an English Bulldog, and an AK-47.

We find there was sufficient evidence establishing that Defendant possessed the stolen .38 revolvers charged in counts two and three, but we find that the evidence was insufficient to support Defendant's conviction of possession of the Fabrique National firearm charged in count five. Unlike the two .38 revolvers, no one testified that they saw Defendant in possession of the Fabrique National firearm. Therefore, we vacate Defendant's conviction and sentence on count five consisting of possession of the Fabrique National firearm.

Freddie testified that he saw Defendant in possession of two .38 revolvers, one of which specifically matched the description of a firearm stolen from the victim's residence (the firearm with the rose on its handle). The victim testified that at least two .38 revolvers were stolen from his home. Shortly after the guns were stolen, Defendant was trying to get rid of the guns for a cheap price and gave

inconsistent stories about where the guns came from. *See State v. Chester*, 97-1001, p. 3 (La. 12/19/97), 707 So.2d 973, 974, where the court stated that "jurors may infer the defendant's guilty knowledge from the circumstances of the offense." Thus, even without a finding that Defendant stole the .38 revolvers from the victim's residence, we find the evidence was sufficient to show that Defendant possessed the two .38 revolvers, that the .38 revolvers were the subject of a theft, and that Defendant knew or should have known they were the subject of a theft.

We note that Defendant challenges the credibility of Freddie due to Freddie's admission that he was addicted to Xanax. However, the jury chose to believe certain portions of Freddie's testimony. The jurisprudence is clear that an appellate court should not second guess the credibility choices made by the trier of fact. *See State v. Davis*, 02-1043 (La. 6/27/03), 848 So.2d 557. We do not do so in this case.

In his reply brief, Defendant challenges the sufficiency of the evidence based on the State's failure to point to specific record references where the State introduced the specifically charged guns into evidence or had a witness identify the specifically charged guns. The bill of information specifically charged Defendant with two counts of possessing Smith & Wesson .38 revolvers and with one count of possessing a Fabrique National semi-auto pistol. We need not address Defendant's argument relative to the Fabrique National semi-auto pistol (count five), as we have already found insufficient evidence to support that conviction. With regard to one of the .38 revolvers, Freddie looked at the pictures introduced into evidence and identified the .38 revolver with a red rose on its handle. Deputy Cormier also identified the gun with the red rose. Thus, the .38 revolver with a red rose on its handle was specifically identified by witnesses in the photograph which

16

was introduced into evidence. The other .38 revolver, however, was not specifically identified and introduced into evidence. Freddie simply testified that he saw Defendant in possession of a couple of .38 revolvers.

Nonetheless, the lack of physical evidence does not render the evidence insufficient. In *State v. Harris*, 07-124 (La.App. 5 Cir. 9/25/07), 968 So.2d 187, the fifth circuit rejected a similar argument regarding the lack of physical evidence. In *Harris*, a detective testified as to the merchandise stolen, and some photographs were introduced into evidence. Because of the state of emergency at the time— Hurricane Katrina—the detective testified that he was prevented from taking the stolen items to police headquarters for processing. The fifth circuit stressed the emergency situation and stated that the testimony of the witnesses was sufficient to support a conviction even with the lack of physical evidence to link the defendant to the crime.

In the instant case, Freddie testified that he saw Defendant in possession of a couple of .38 revolvers in addition to the .38 revolver with a red rose on its handle. The victim testified that a matching set of .38 revolvers was stolen from his home along with a .38 revolver with a rose on its handle. Therefore, we find that there was sufficient evidence for a jury to find that Defendant possessed the two .38 revolvers even though both guns were not introduced into evidence.

We note that the bill of information specifically charged Defendant with possessing two .38 Smith & Wesson revolvers. However, no one testified that the .38 revolvers at issue in this case were Smith & Wesson revolvers. The only testimony at trial regarding the Smith & Wesson labeling was Deputy Mefford's testimony that State Exhibit 4 contained a plastic Smith & Wesson box. There is no case directly on point as to the issue of whether the State was required to prove

that the guns the Defendant possessed were Smith & Wesson guns.  Nevertheless, "in crimes against property, it is essential only 'that it should be alleged and proven to have been the property of another than the accused.'"  *State v. Dunbar*, 07-219, p. 7 (La. 2/26/08), 978 So.2d 899, 903 (quoting *State v. Harris*, 42 La.Ann. 980, 8 So. 530 (1890)).

In the instant case, the labeling of the two .38 revolvers as Smith & Wesson was not essential to proving that the guns belonged to someone other than Defendant.  Thus, the State's failure to prove the two .38 revolvers were Smith & Wesson did not affect the sufficiency of the evidence.

Finally, Defendant argues that because the evidence was insufficient to find him guilty of all three counts of illegal possession of stolen firearms, the evidence was also insufficient to find him guilty of possession of a firearm by a convicted felon.  As set forth herein, we have found that the evidence was sufficient to prove that Defendant possessed two stolen .38 caliber firearms in this case.  Thus, Defendant's argument as to the insufficiency of the evidence to prove possession of a firearm by a convicted felon has no merit.

**ASSIGNMENT OF ERROR NUMBER TWO:**

In this assignment of error, Defendant asserts that his conviction and sentence for possession of a firearm by a felon violated his constitutional right to keep and bear arms set forth in La.Const. art. 1, §11.  Citing *State v. Draughter*, 13-914 (La. 12/10/13), 130 So.3d 855, Defendant contends:

> The Louisiana Supreme Court has recognized that [La.Const. art. 1, § 11], calls into question the continued constitutionality of La.R.S. 14:95.1 to the extent that the legislature seeks to limit the fundamental right of citizens, such as Mr. Webb, to keep and bear arms, unless they remain in the custody of the Department of Corrections.

18

In response, the State asserts that this issue should not be considered as it was not properly preserved in the lower court. Citing *State v. Hatton*, 07-2377 (La. 7/1/08), 985 So.2d 709, the State argues that "[a]n appellate court should not consider a constitutional challenge unless it was presented appropriately at the trial court level." According to the State, Defendant did not preserve the issue in the present case. Because the issue was not properly raised in the lower court, the State argues that it cannot fully analyze the constitutional issue:

> The State cannot fully analyze the constitutional issue presented herein because the defendant failed to establish certain pertinent information at the trial court level, including the precise status of his state supervision as of the date of the pertinent offenses. Moreover, the defendant has failed to properly serve the Louisiana Attorney General's Office with what is undeniably a constitutional challenge. This service is legally required. [La.R.S.] 49:257(C); [La.R.S.] 13:4448; *State v. Schoening*, [00-903] (La. 10/17/00), 770 So.2d 762, 765-766. For all of these reasons, this claim should not even be considered by this Court.

We note that this court notified the Attorney General's Office of the constitutional attack by certified letter mailed April 15, 2014. The Attorney General was given fifteen days from the date of the notice to file a brief in this court. No such brief has been filed.

In *Hatton*, 985 So.2d at 718 (citing *Vallo v. Gayle Oil Co.,* 94-1238 (La. 11/30/94), 646 So.2d 859), the supreme court stated, "It is well-settled that a constitutional challenge may not be considered by an appellate court unless it was properly pleaded and raised in the trial court below." The supreme court further described the procedure for attacking the constitutionality of a statute as follows:

> While there is no single procedure for attacking the constitutionality of a statute, it has long been held that the unconstitutionality of a statute must be specially pleaded and the grounds for the claim particularized. This Court has expressed the challenger's burden as a three step analysis. First, a party must raise the unconstitutionality in the trial court; second, the

unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized. The purpose of these procedural rules is to afford interested parties sufficient time to brief and prepare arguments defending the constitutionality of the challenged statute. The opportunity to fully brief and argue the constitutional issues provides the trial court with thoughtful and complete arguments relating to the issue of constitutionality and furnishes reviewing courts with an adequate record upon which to consider the constitutionality of the statute.

. . . .

Thus, in light of the foregoing jurisprudential rules, in order to properly confect a constitutional challenge, a party must raise the constitutional issue in the trial court by raising the unconstitutionality and the grounds outlining the basis of the alleged unconstitutionality in a pleading.

*Id.* at pp. 719-20 (citations omitted).

Since Defendant in the present case did not raise the constitutionality of La.R.S. 14:95.1 in the lower court and has failed to allege any applicable exception to this general rule, this issue is not properly before this court on appellate review. Thus, a review of the merits of Defendant's constitutional claim is pretermitted.

**ASSIGNMENT OF ERROR NUMBER THREE:**

In this assignment of error, Defendant alleges that the trial court imposed an unconstitutionally harsh and excessive sentence. Although Defendant was given four separate sentences—three consecutive sentences of five years each on the three counts of illegal possession of stolen firearms and one enhanced sentence of fifty years for possession of a firearm by a convicted felon, to run consecutively—Defendant challenges the excessiveness of the aggregate effect of the sentences as follows:

In this matter, a sentence of 65 years of imprisonment – 50 years of which are to be served without benefit of probation, parole, or suspension of sentence – while statutorily permissible is constitutionally excessive. It makes no measurable contribution to

20

acceptable goals of punishment and amounts to nothing more than purposeful imposition of pain and suffering.

In the instant matter, the predominate issues are whether the sentence is grossly out of proportion to the severity of the crime and whether the [t]rial [c]ourt's sentence was nothing more than purposeless and needless imposition of pain and suffering. Based on the facts of this case and the weak evidence in this matter, it is submitted that the sentence was excessive.

As set forth in supplemental assignment of error number four as well as pro se assignments of error numbers five through seven, we vacate Defendant's adjudication and sentence as a fourth habitual offender and remand the case for further proceedings consistent with this opinion. As a result thereby, Defendant's excessiveness claim as to his fifty-year enhanced sentence for possession of a firearm by a convicted felon has been rendered moot. Though we vacate Defendant's habitual offender adjudication and sentence and have vacated his conviction and sentence on the one count of illegal possession of a stolen firearm relative to the Fabrique National firearm (count five), that does not render moot a review of Defendant's non-enhanced five-year sentences on the remaining two counts of illegal possession of stolen firearms (counts two and three). In reviewing the non-enhanced five-year consecutive sentences relative to illegal possession of stolen firearms, we find that Defendant failed to prove that the trial court's sentences relative to those charges were excessive.

**SUPPLEMENTAL ASSIGNMENT OF ERROR NUMBER FOUR:**

In his supplemental brief, Defendant alleges that the trial court erred in finding that he was a fourth habitual offender, when, in fact, the State offered evidence sufficient to establish only that he was a second habitual offender. Defendant points out that in the habitual offender bill, the State charged him with the following predicate convictions: aggravated crime against nature and two

counts of simple burglary for which Defendant was convicted in Cameron Parish on May 3, 2001. According to the minutes of the habitual offender hearing, the State omitted the aggravated crime against nature conviction from the habitual offender bill. At the habitual offender hearing, the State explained that the conviction was being withdrawn since the cleansing period had lapsed. Thus, the only remaining predicate convictions listed on the habitual offender bill were Defendant's two convictions for simple burglary on May 3, 2001, in Cameron Parish. Defendant argues that according to La.R.S. 15:529.1(B), the two simple burglary convictions could only count as one conviction. Louisiana Revised Statutes 15:529.1(B) provides, in pertinent part: "Multiple convictions obtained on the same day prior to October 19, 2004, shall be counted as one conviction for the purpose of this Section." Consequently, he alleges that, at most, the State could only prove that he was a second habitual offender.

In challenging the trial court's finding that he is a fourth habitual offender, Defendant asserts that the trial court wrongfully used his instant three convictions of illegal possession of stolen firearms to enhance as a fourth offense his instant conviction for possession of a firearm by a convicted felon. Defendant relies upon La.R.S. 15:529.1(A), which states:

> Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony[.]

Defendant further asserts:

> [Louisiana Revised Statutes] 15:529.1(A) allowed the Trail [sic] court to enhance the sentence of Carl James Webb, Jr., for his instant conviction for possession of a weapon by a convicted felon based on convictions that the State proved Mr. Webb had before he was

22

convicted of the instant charges. However, the [t]rial [c]ourt erred by using Mr. Webb's instant convictions for three counts of illegal possession of a stolen firearm to enhance Mr. Webb's instant conviction for possession of a weapon by a convicted felon.

The error complained of by Defendant is a violation of the requirement that "for sentence enhancement purposes, the subsequent felony [(the felony being enhanced)] must be committed *after* the predicate conviction or convictions." *State v. Johnson*, 03-2993, p. 18 (La. 10/19/04), 884 So.2d 568, 578 (emphasis added), *superseded by statute on other grounds as stated in Butler v. Cain*, 327 Fed.Appx. 455 (5th Cir. La. 2009). In the instant case, Defendant was convicted of three counts of illegal possession of stolen firearms (the predicate convictions) on the same day that he was convicted of possession of a firearm by a convicted felon (the felony being enhanced). Thus, the trial court erroneously used Defendant's three instant convictions of illegal possession of stolen firearms as predicates to enhance his instant sentence for possession of a firearm by a convicted felon since the felony being enhanced was not *committed after* Defendant's *convictions* of the predicate offenses and is, therefore, a violation of the sequencing procedure set forth in La.R.S. 15:529.1(A).

The State argues that Defendant is precluded from raising this argument on appeal since he failed to raise it in the trial court. As its authority, the State cites La.Code Crim.P. art. 841 and various cases for the proposition that a defendant is limited on appeal to the grounds for an objection articulated at trial. As the State asserts, Defendant did not raise this objection at the habitual offender hearing. This court has stated the following regarding a defendant's failure to lodge a contemporaneous objection at trial:

> Absent a contemporaneous objection, ordinarily a defendant may not complain of an erroneous charge to the jury on appeal. However,

23

> Louisiana courts have recognized certain rights are so basic and "due process" requirements mandate that they may be asserted for the first time on appeal or noticed as an error patent by mere inspection of the pleadings and proceedings. [La.Code Crim.P. art.] 920(2); *State v. Thomas*, 427 So.2d 428 (La.1982).

*State v. Pyke*, 93-1506, p. 3 (La.App. 3 Cir. 5/4/94), 640 So.2d 460, 462. Thus, we will first address whether this error complained of by Defendant is an error patent which would be recognizable by this court without the necessity of an objection in the lower court.

In *State v. Patton*, 10-1841, pp. 28-29 (La.App. 1 Cir. 6/10/11), 68 So.3d 1209, 1228 (footnote omitted), the first circuit recognized this type of error in its error patent review:

> [A]lthough the defendant does not specifically articulate the following, pursuant to the request in the counseled brief and our routine review in accordance with [La.Code Crim.P.] art. 920(2), we have reviewed the record for errors discoverable by a mere inspection of the pleadings and proceedings without inspection of the evidence and note the following. Although [La.R.S.] 15:529.1 does not contain a sequential conviction requirement, for sentence enhancement purposes, the subsequent felony must be committed after the predicate conviction or convictions. *State v. Johnson*, [03-2993] (La. 10/19/04), 884 So.2d 568, 578-79. Two of the predicate convictions listed in the habitual offender bill of information took place after the 1987 forcible rape offense forming the basis for the instant enhanced conviction. Thus, the instant felony was not committed after those predicate convictions and the habitual offender adjudication and enhanced sentence imposed on count two must be vacated.

Likewise, in *State v. Roshell*, 40,374, pp. 10-11 (La.App. 2 Cir. 12/14/05), 916 So.2d 1268, 1273-74, *writ denied*, 06-771 (La. 10/6/06), 938 So.2d 69, the second circuit recognized as an error patent the fact that the defendant had not been convicted of one of his predicate offenses before he committed the felony the State sought to enhance:

> In reviewing the record for error patent, we find that the defendant was improperly adjudicated a third felony offender. The habitual offender provisions found in La.R.S. 15:529.1(A)(1) provide,

24

in pertinent part, "Any person who, **after having been convicted** within this state of a felony . . . , **thereafter commits any subsequent felony** within this state, upon conviction of said felony, shall be punished as follows . . . ." (Emphasis added.) This statute and jurisprudence require that prior convictions must precede the commission of the principal offense in order for use to enhance a defendant's status as a multiple offender. . . .

    . . . .

The listing of convictions shows that at the time of the commission of the third felony, the defendant had not yet been convicted of the forgery used as the second felony offense for purposes of adjudication as a third felony offender. In light of this error in the habitual offender adjudication, we hereby reverse the defendant's adjudication as a third felony offender and the 100 year sentence for the count three armed robbery as a third felony offense. We remand the matter to allow the state to bring a new habitual offender proceeding and for the trial court to then re-sentence the defendant on the enhanced armed robbery conviction.

Also, in *State v. London*, 09-398 (La.App. 5 Cir. 11/24/09), 28 So.3d 1150, the fifth circuit recognized as an error patent a defect in the habitual offender bill since the State sought to enhance the defendant's manslaughter sentence based on an aggravated battery conviction that was not obtained before the commission of the manslaughter. Although the court did not label it an error patent, in *State v. Gilbert*, 99-315 (La.App. 5 Cir. 4/25/00), 760 So.2d 536, the fifth circuit found the habitual offender bill contained a legal defect since the defendant was not convicted of his predicate offense before he committed the offense for which the State sought enhancement. The fifth circuit stated, "Although [the defendant] admitted to being a habitual offender, he is not in fact a habitual offender under the provisions of La.R.S. 15:529.1 and the prior conviction cannot be used to enhance his sentence." *Id.* at 540.

Additionally, in *State v. Fisher*, 570 So.2d 546 (La.App. 4 Cir. 1990), the fourth circuit labeled this type of error as an error patent and found that the

25

defendant was not precluded from raising it on appeal. The defendant alleged as an assignment of error that one of his predicate offenses could not be used for enhancement purposes under La.R.S. 15:529.1(A) since he was convicted of the predicate offense after he committed the offense for which the State sought enhancement. Like the State in the present case, the State in *Fisher* argued that the defendant was precluded from raising the issue on appeal. The fourth circuit rejected the State's argument by stating the following: "Because this is an error that is discoverable by a mere inspection of the pleadings and proceedings, [La.Code Crim.P.] art. 920, we do not address the State's argument that the defendant is barred from raising the issue on appeal since he stipulated to his identity in the predicate offense." *Id.* at 547 n.1.

Considering the foregoing jurisprudence, we find the current error is an error patent and may be recognized despite the absence of an objection. Additionally, we find the error affects such a basic due process right of Defendant that it can be raised for the first time on appeal. Thus, we will address the merits of the error.

We find that Defendant is correct in his assertion that the trial court erroneously used his instant convictions for illegal possession of stolen firearms as predicates to enhance his instant sentence for possession of a firearm by a convicted felon. By doing so, the trial court violated the sequencing procedure set forth in La.R.S. 15:529.1(A)—*conviction* of the predicate offense and then *commission* of the offense being enhanced. As previously set forth, in the habitual offender bill, the State charged Defendant with committing the predicate convictions of aggravated crime against nature and two counts of simple burglary for which Defendant was convicted in Cameron Parish on May 3, 2001. The State withdrew the aggravated crime against nature conviction as a predicate conviction

26

since the cleansing period had lapsed. Thus, the only remaining prior convictions listed on the habitual offender bill were Defendant's two prior convictions for simple burglary on May 3, 2001, in Cameron Parish. Consequently, it was legal error for the trial court to adjudicate Defendant as a fourth felony offender. Therefore, we vacate Defendant's habitual offender adjudication and sentence, and we remand the matter for further proceedings consistent with this opinion.

**PRO SE ASSIGNMENTS OF ERROR NUMBERS FIVE, SIX, & SEVEN:**

In these assigned errors, Defendant contends the trial court erred in adjudicating him a fourth felony offender. Specifically, he claims the State was prohibited from using his two Cameron Parish burglary convictions for both the conviction of possession of a firearm by a convicted felon and then as predicate offenses for habitual offender purposes. Absent these predicates, Defendant claims there is no prior conviction to be used to adjudicate him a second, third, or fourth level offender. Accordingly, Defendant contends he "can not be sentenced or enhanced on possession of firearm as convicted felon due to no first offense sentencing range pursuant to [La.R.S. 15:529.1]." Because we vacated Defendant's habitual offender adjudication and sentence in Supplemental Assignment of Error Number 4, the issues raised in these assigned errors have been rendered moot.

**PRO SE ASSIGNMENTS OF ERROR NUMBERS EIGHT & NINE:**

In a separate subsequent pro se brief filed on June 2, 2014, Defendant assigns two supplemental pro se assignments of error. Because of the similarity of the alleged errors, we will address them together. Defendant alleges that the trial court erred in denying his motion for mistrial based on a newspaper article that was printed the morning of the jury venire selection. According to Defendant, the

27

article revealed other crimes evidence which may have tainted the jury.[3] Additionally, Defendant argues that the trial court erred in denying his trial counsel's request to poll the jurors regarding the prejudicial article.

At the beginning of the second day of jury selection, Defendant's trial counsel moved for a mistrial based on a "lead headline" in that morning's newspaper. Although the State had no objection to the introduction of the article, the State argued that the article was not prejudicial, thereby warranting a mistrial. The trial court denied the motion for mistrial, stating that he had admonished the jury panel not to read anything. Anticipating that he would seek a writ on the issue, trial defense counsel asked to preserve the record:

MR. ST. DIZIER:

But this goes way, way beyond publicity, Your Honor. This introduces evidence that's forbidden at trial. Now, if the evidence of this other crime came out in trial or other bad acts, the remedy would not be to admonish the jury or to pole [sic] the jury or anything like that. It would be over. Okay?

This is quantitatively and qualitatively different from publicity. Number 1, it's not removed in time. Number 2, it introduces illegal evidence, and there's nothing --

THE COURT:

No evidence has been introduced, Mr. St. Dizier.

MR. ST. DIZIER:

There's -- there's no -- well, it introduces information to the jury that they're not allowed to have.
THE COURT:

And were -- and were told not to look at it so.

---

[3] Although defense counsel introduced the article into evidence, the article was not included in the appellate record.

MR. ST. DIZIER:

. . . .

And it's -- it's incredibly inflammatory, and I will -- you know, I will certainly move for a mistrial. Failing that, I will take writs.

THE COURT:

You've moved for a mistrial. I've denied it. You may certainly take writs.

MR. ST. DIZIER:

Okay.

THE COURT:

And, you know, you're making a lot of assumptions here about what people do and don't do, and that's not how we operate; but I -- you know, I can certainly understand the concern when it's on the paper like that; but, you know, we've dealt with it. We anticipate that there's publicity, and that's how we always deal with it, and the fact that there was a headline that could have been misleading or was misleading in the big scheme of things, they knew not to look at that. And so I'm comfortable with -- the jury was properly admonished, and we can go on.

Trial defense counsel argued further that the prospective jurors may not have known that the article was about the current trial and may have read further into the article. The trial court replied by stating that trial defense counsel would have thirty days to seek writs, and it refused to stay the proceedings.

Trial defense counsel then moved to individually question each juror as to his or her exposure to the article. The trial court asked for the State's response, and the following colloquy took place:

MR. BLAKE:

Judge, I don't -- I don't have a problem with poling [sic] the jurors to determine whether or not they were affected by anything in the paper, but I think what's going to end up happening is, is that

you're going to end up doing something that you're trying to prevent in the first place by actually --

THE COURT:

Yeah.

. . . .

THE COURT:

The admonition is in place.

MR. BLAKE:

Yeah.

THE COURT:

I expect any juror to step forward and say, "I broke the rule. I didn't know I was breaking the rule, because the headline didn't advise me of that," so I'm going to rely on the jurors to police themselves. And, you know, I think we did what we were supposed to do, and we have to trust that. So as I'm -- I'm verbalizing, thinking out loud, so I don't want you to go into it on your voir dire. We can't assume that people have been tainted or have looked at things that we told them not to look at; and so we're going to operate under the assumption that, as we always do, that they followed my orders and didn't look at anything. So if they -- obviously, if they -- if any juror advises us that they weren't able to follow that [sic] it was a mistake, then we'll deal with that. Okay? Do you understand?

The admonition referred to by the trial court was given at the conclusion of the previous day's questioning. At that time, the trial court instructed the prospective jurors not to research the case independently. The trial court also specifically instructed the prospective jurors not to search the internet, read the newspapers, or watch TV. The trial court stated that, "If something comes on tonight or at any time during this trial or in the newspaper, you are to turn away your eyes and not listen to it, and you're not to talk to anyone about the case."

Trial defense counsel noted his objection to the trial court's decision not to allow him to question the prospective jurors individually, and the prospective

30

jurors were seated. The trial court then addressed the prospective jurors as follows:

> All right. Ladies and gentlemen, we're going to continue on voir dire. First of all, I need to make sure that everyone followed the Court's order and there's no -- no one has any issue about having done any research or learned anything about the case or any kind of outside information relating to this case from outside sources.
>
> Everyone comfortable with still having that clean slate that we talked about last night? If you have any concerns about that, raise your hand. Okay. No hands are raised. Everyone is still untainted by any outside information; is that correct? If it's not correct, raise your hand and we'll talk about it, and we can do it privately, if necessary. Okay? Okay. Very good.

None of the jurors expressed any concerns at that point.

Later, when the next panel of prospective jurors was seated for questioning, the trial court addressed the panel as follows:

> Okay. Folks, you had to sit through about four hours of this, which is a tough job when you're not being questioned yourself. But you heard what I said to the earlier panel and what the lawyers have said, and I just need to make sure initially whether or not anyone on the panel has anything that they need to bring to our attention based on what you've heard the last few hours today and yesterday that you think need to be said so we can know whether or not you're appropriate or not appropriate to serve on a jury.

In response to the trial court's statement, prospective juror Ms. Frohn stated that she had picked up the American Press that morning. At a bench conference, Ms. Frohn explained that she read two paragraphs of the article printed that morning. Ms. Frohn stated that she would listen to the evidence presented but was unsure of how much the article would affect her decision. The trial court excused Ms. Frohn. No other prospective jurors alerted the trial court that they read the news article.

In a factually similar case, the supreme court found similar measures taken by the trial court were sufficient to ensure that the publicity did not taint the jury.

*See State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So.2d 877, *cert. denied*, 537 U.S. 1227, 123 S.Ct. 1266 (2003). As in the present case, Bridgewater moved for a mistrial based on an article that appeared in the newspaper on the second day of jury selection. The article reported that Bridgewater and his co-defendant admitted to being at the crime scene, but each accused the other of being the shooter. Bridgewater argued that the article tainted the entire jury panel and that "'appropriate measures were not taken to ensure that prospective jurors . . .' were not tainted by the prejudicial publicity." *Id.* at 898. The supreme court disagreed with Bridgewater and found the following measures taken by the trial court were sufficient to ensure the publicity did not taint the jury:

> In denying the mistrial motion, the trial judge agreed to question each of the jurors about their exposure to the article and to repeat his prior instruction to the panel that they are not to read the newspaper. Moreover, both jurors who admitted they read the article were excused and two other jurors who indicated they were exposed to prior articles or publicity were excused. And, as the state stresses, none of the jurors who actually decided the case were exposed to the article.

*Id.* at 917, n.24.

Likewise, the trial court in the instant case questioned both jury panels as to their exposure to the newspaper article. None of the prospective jurors in the first panel alerted the trial court that he or she had seen the article. One of the jurors in the second panel, however, informed the trial court that she read the article and was promptly excused.

Finally, we note that as the court in *Bridgewater* stated: "[M]istrial is a drastic remedy warranted only when substantial prejudice implicates the fairness of trial and that the trial judge has broad discretion in determining whether conduct is so prejudicial as to deprive an accused of a fair trial[.]" *Id.* at 897. Speaking to

prejudicial publicity in particular, the supreme court stated that La.Code Crim.P. art. 775 does not warrant a mistrial "'absent a determination that the jurors were actually exposed to the publicity in question and were so impressed by it as to be incapable of rendering a fair and impartial verdict.'" *Id.* at 898 (quoting *State v. Russell*, 416 So.2d 1283, 1290 (La.), *cert. denied*, 459 U.S. 974, 103 S.Ct. 309 (1982)). No such showing was made by Defendant in the instant case. Accordingly, these pro se assignments of error lack merit.

## DISPOSITION

Defendant's convictions and sentences on counts two and three (illegal possession of two stolen .38 revolvers) are affirmed. Defendant's conviction for possession of a firearm by a convicted felon is affirmed. Defendant's conviction and sentence on count five (illegal possession of a stolen Fabrique National firearm), however, is vacated due to insufficient evidence. Defendant's habitual offender adjudication and sentence for possession of a firearm by a convicted felon is vacated, and the case is remanded for further proceedings consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**